NICOLE S. PHILLIS (State Bar No. 291266) (*admission pending*)
   nicolephillis@dwt.com
MATTHEW E. LADEW (State Bar No. 318215)
   mattladew@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California  90017-2566
Telephone:  (213) 633-6800

HARRY J. F. KORRELL (*pro hac vice forthcoming*)
   harrykorrell@dwt.com
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue
Seattle, Washington  98104-1610
Telephone:  (206) 622-3150

SCOTT ALLYN SCHIPMA (*pro hac vice forthcoming*)
   scott.schipma@geogroup.com
JOSEPH NEGRON, JR. (*pro hac vice forthcoming*)
   jnegron@geogroup.com
4955 Technology Way
Boca Raton, Florida 99431
Telephone:  (561) 999-7615

Attorneys for Plaintiff
THE GEO GROUP, INC.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| THE GEO GROUP, INC., a Florida corporation, | Case No. |
| Plaintiff, | **COMPLAINT** |
| v. | |
| GAVIN C. NEWSOM, in his official capacity as Governor of the State of California; ROB BONTA, in his official capacity as Attorney General of the State of California; and KRISTOPHER LYON, in his official capacity as Kern County Health Officer, | |
| Defendants. | |

1

For its Complaint against Defendants Gavin C. Newsom, Rob Bonta, and Kristopher Lyon, Plaintiff The GEO Group, Inc. ("GEO"), by counsel, states as follows:

## JURISDICTION

1.      GEO seeks relief on all claims pursuant to 28 U.S.C. §§ 2201, 2202, 2412; 42 U.S.C. § 1983; and *Ex parte Young*, 209 U.S. 123 (1908).

2.      This Court has jurisdiction under 28 U.S.C. § 1331 because the questions of whether SB-1132, the law challenged here, violates the Supremacy Clause of the United States Constitution, whether it is preempted by federal law, and whether it violates the Constitution's Contracts Clause are federal questions.

3.      This Court also has jurisdiction under 28 U.S.C. § 1332 because The GEO Group, Inc. and the Defendants are citizens of different states and the value of the declaratory and/or injunctive relief sought by GEO exceeds $75,000.  GEO estimates that complying with SB-1132 would cost in excess of $500,000.

## VENUE

4.      Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this claim occurred, or a substantial part of the property that is the subject of this action is situated, in this District and Division.

5.      The Mesa Verde ICE Processing Center, the Central Valley Annex, and the Golden State Annex are in this District and Division, and SB-1132 purports to empower county and city officials, including Defendant Lyon, to enter and inspect these facilities for compliance with state standards.

## NATURE OF THIS ACTION

6.      GEO brings this action for declaratory and injunctive relief against Defendants Governor Gavin C. Newsom, in his official capacity as Governor of the State of California, Rob Bonta, in his official capacity as Attorney General of the State of California, and Kristopher Lyon, in his official capacity as Kern County Health Officer, regarding California Senate Bill 1132, codified as amended upon passage in Health and Safety Code Section 101045 ("SB-1132").

7.       This case involves the latest in a string of attempts by the State of California to ban

COMPLAINT

federal immigration enforcement in the state, or so significantly burden such efforts as to drive federal agencies and contractors involved in that constitutionally mandated national security function from California.   In 2019, California enacted AB-32 which purported to outlaw any "private detention facility within the state."  The Ninth Circuit, sitting en banc, struck down AB-32 as violative of the Supremacy Clause of the United States Constitution as to U.S. Immigration and Customs Enforcement ("ICE") contracted facilities.  *Geo Grp., Inc. v. Newsom*, 50 F.4th 745 (2022) (en banc).

8.     Similarly, California enacted several statutes (AB-103, AB-54, AB-450) aimed at "protecting immigrants from an expected increase in federal immigration enforcement actions."  The Ninth Circuit struck down portions of AB-103 as unlawful under the doctrine of intergovernmental immunity, while upholding only narrowly limited provisions of AB-103 that allowed the California Attorney General to enter ICE immigration detention facilities to conduct "reviews" of the conditions of confinement and the standard of care.  *United States v. California*, 921 F.3d 865 (2019).  Notably, in defense of those narrow "review" provisions, California argued that "***AB 103 does not impose standards on the conditions of facilities, nor does it mandate any policies and procedures***."   As a result, California noted "***there is no conflict with the national detention standards promulgated by ICE***," and AB-103 includes "***no enforcement mechanism***."  In reaching its decision the Ninth Circuit specifically noted that AB-103 did not regulate confinement or impose mandates on the ICE contractors, but ***merely required access*** for inspections and the production of data. *California*, 921 F.3d at 885.  That was then, and this is now.

9.     Unsatisfied with the California Attorney General's "reviews" of federal immigration operations conducted pursuant to AB-103, California now seeks through SB-1132 to directly control the federal immigration operations of ICE and its contractors, and replace the uniform federal detention standards authorized and specifically implemented at the direction of Congress with California's enforcement of its own labyrinthine of often-conflicting state standards.

10.     Two hundred years ago, in the foundational case of *McCulloch v. Maryland*, Chief Justice John Marshall invoked the "great principle" that "the constitution and the laws made in pursuance thereof are supreme; that they control the constitution and laws of the respective states,

3

and cannot be controlled by them."  17 U.S. (4 Wheat.) 316, 426 (1819).  This principle "so entirely pervades the constitution, is so intermixed with the materials which compose it, so interwoven with its web, so blended with its texture, as to be incapable of being separated from it, without rending it into shreds."  *Id*.  Based on this bedrock precept—derived from the Supremacy Clause of the United States Constitution—it has been incontestable from *McCulloch* onward that "the activities of the Federal Government are free from regulation by any state."  *Hancock v. Train*, 426 U.S. 167, 178 (1976) (quotation marks omitted).

11.     And just as the activities of the Federal Government may not be directly regulated by any state, "[t]he government of the United States, … though limited in its powers, is supreme; and its laws, when made in pursuance of the constitution, form the supreme law of the land, 'anything in the constitution or laws of any state to the contrary notwithstanding.'"  *McCulloch*, 17 U.S (4 Wheat.) at 406; *see also Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211 (1824) (Marshall, C.J.) (explaining that the Supremacy Clause ensures that States cannot enact laws that "interfere with, or are contrary to the laws of Congress").  This power of Congress to preempt inconsistent state laws is, like the federal government's immunity from state regulation, a "fundamental principle of the Constitution."  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000).

12.     There is no question that the federal government has the power to detain individuals in anticipation of, or as a consequence of, federal immigration proceedings.  *See, e.g.*, *Wong v. United States*, 163 U.S. 228, 235 (1896).  Nor is there any question that the Federal Government has the authority to contract with private entities with expertise in the operation of detention facilities to carry out its detention responsibilities.  And indeed, Congress has enacted statutes that clearly authorize the Executive Branch to house federal detainees in private facilities as that Branch deems appropriate. *See, e.g.*, 6 U.S.C. § 112(b)(2); 8 U.S.C. § 1231(g); 18 U.S.C. § 4013 note "Contracts for Space or Facilities"; 28 U.S.C. § 530C(a)(4).

13.     Congress also specifically directed ICE to implement the federal detention standards contained in ICE's Performance Based National Detention Standards ("PBNDS") in all contracts for immigration detention services.  163 Cong. Rec. H3812 (2017); H.R. Rep. No. 114-668, at 35 (2016).  Congress created the Office of the Immigration Detention Ombudsman to, *inter alia*,

4

investigate complaints and conduct investigations of any alleged violations of these federal "detention standards." 6 U.S.C. § 205(b)(5). Unmistakably, Congress has expressed the intent that the PBNDS shall govern the conditions of confinement of those held in federal immigration detention and that the federal government shall monitor and assess compliance with the same.

14.     This lawsuit challenges a California statute that represents California's latest deliberate effort to obstruct and control the United States' enforcement of federal immigration law through the direct regulation of federal immigration detention and the private entities that contract with federal authorities to carry out federal immigration enforcement efforts. The Supremacy Clause does not allow California to obstruct the United States' ability to enforce laws that Congress has enacted or to take actions entrusted to it by the Constitution.

15.     GEO, as the contractor providing services at several federal detention facilities threatened by SB-1132, brings this action to reassert the foundational principles laid down in *McCulloch v. Maryland* two centuries ago and affirmed by the Ninth Circuit in *Geo Group, Inc. v. Newsom*. This Court should declare SB-1132 unconstitutional and enter a preliminary and permanent injunction restraining Defendants from enforcing SB-1132 against GEO.

## PARTIES

16.     Plaintiff The GEO Group, Inc. is a corporation organized and existing under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida.

17.     Defendant Gavin C. Newsom is a citizen of California and the Governor of the State of California. He has "[t]he supreme executive power" of the State of California (the "State") and is charged with "see[ing] that the law is faithfully executed." Cal. Const. art. V, § 1. As head of the Executive Branch, he has a duty to "supervise the official conduct of all executive and ministerial officers," including the Attorney General. Cal. Gov't Code § 12010. In light of these duties, Governor Newsom has responsibility for enforcing SB-1132. He is sued in his official capacity.

18.     Defendant Rob Bonta is a citizen of California and the Attorney General of the State of California. He is "the chief law officer of the State" with "the duty … to see that the laws of the State are uniformly and adequately enforced." Cal. Const. art. V, § 13. In light of these duties, Attorney General Bonta has responsibility for enforcing SB-1132. He is sued in his official capacity.

5

**COMPLAINT**

19.     Defendant Kristopher Lyon, MD, FACEP, is a citizen of California and the Health Officer for Kern County.  The "county health officer" is empowered by the statute challenged here. Because the facilities primarily affected by SB-1132 are in Kern County, GEO Group seeks to enjoin the ability of anyone in that county's health office from complying with SB-1132.

**FACTUAL ALLEGATIONS**

**I.      SB-1132**

20.     A July 2, 2024 California Bill Analysis regarding SB-1132 prepared by the Assembly Committee on Public Safety on includes an explicit proclamation of the legislature's intent to usurp federal supremacy on immigration detention and replace the Congressionally mandated federal detention standards:

> The federal government contracts with private detention facilities across the country to house immigration detainees. There are currently six private detention facilities operating in California in four counties San Bernardino County, Kern County, San Diego County, and Imperial County. *** According to the California Department of Justice, facilities that contract to hold detained noncitizens are also required to comply with national detention standards, which establish requirements for emergency planning, security protocols, detainee classification, discipline, medical care, food service, activities and programming, detainee grievances, and access to legal services. The standards set the expectation that the Centers for Disease Control and Prevention guidelines for the prevention and control of infectious and communicable diseases are to be followed and directs each facility have written plans that address the management of infectious and communicable diseases.
>
> * * *
>
> [I]mmigrant rights organizations sent a letter to public health officials in Kern County asking about LHO oversight, including how it planned to ensure detainees were being tested for COVID-19. In response, the county's director of public health services said they did not have jurisdiction over the center. CalMatters indicated that there were similar instances of confusion over jurisdiction in other counties. This bill clarifies that LHOs have authority to inspect private detention facilities as deemed necessary.
>
> * * *
>
> The goal of SB 1132 is to ensure that county health officials have the ability to enter these facilities when necessary. The bill does not impose an annual inspection requirement to county health officials, but empowers them to ensure that these private facilities adhere to public health orders and guidelines that are necessary to keep our state safe.

California Bill Analysis, S.B. 1132 Sen., July 2, 2024, California Bill Analysis, S.B. 1132 (emphasis added).

21.     On August 19, 2024 Governor Newsom signed SB-1132 into law.

6

22.     SB-1132, *inter alia*, adds Section 101045 to the California Health and Safety Code which now provides, in relevant portion:

> 101045. (a) *** The county health officer shall, at least annually, investigate health and sanitary conditions in a county jail, publicly operated detention facility in the county, and private work furlough facility and program established pursuant to Section 1208 of the Penal Code. *** The county health officer may make additional investigations of a county jail, private detention facility, or other detention facility of the county as they determine necessary. *** In a city having a health officer, the city health officer shall, at least annually, investigate health and sanitary conditions in a city jail and other detention facility. The city health officer may make additional investigations of a city jail, private detention facility, or other detention facility as they determine necessary.
>
> (b) Whenever requested by the sheriff, the chief of police, local legislative body, or the Board of State and Community Corrections, but not more often than twice annually, the county health officer or, in cities having a city health officer, the city health officer, shall investigate health and sanitary conditions in a jail or detention facility described in this section, and submit a report to each of the officers and agencies authorized in this section to request the investigation and to the Board of State and Community Corrections.
>
> (c) The investigating officer shall determine if the food, clothing, and bedding is of sufficient quantity and quality that at least <u>shall equal minimum standards and requirements prescribed by the Board of State and Community Corrections for the feeding, clothing, and care of prisoners in local jails and detention facilities</u>, and if the sanitation requirements required by Article 1 (commencing with Section 114250) of Chapter 8 of Part 7 of Division 104 for restaurants have been maintained. (emphasis added).

23.     For purposes of SB-1132, "private detention facility" is defined as "a detention facility that is operated by a private, nongovernmental, for-profit entity pursuant to a contract or agreement with a governmental entity." *See* Cal. Health & Safety Code § 101045(d) (incorporating definition from Section 7320 of the Government Code).

24.     The "minimum standards and requirements prescribed by the Board of State and Community Corrections" referenced in Section 101045(c) are found in the California Administrative Code Section 1000 *et seq.* These minimum standards, and those incorporated by reference, span several hundred pages and impose hundreds of significant detailed requirements and compliance obligations in the following areas:   (1) Inspection and Application of Standards, (2) Training, Personnel, and Management, (3) Records and Public Information, (4) Classification and Separation, (5) Programs and Services, (6) Discipline, (7) Minors in Jails, (8) Minors in

COMPLAINT

Temporary Custody in a Law Enforcement Facility, (9) Minors in Court Holding Facilities, (10) Medical/Mental Health Services, (11) Food, (12) Clothing and Personal Hygiene, (13) Bedding and Linens, and (14) Facility Sanitation and Safety.  These standards are attached as **Exhibit A** to this Complaint.

25.   California Administrative Code Section 1010 sets out a listing of applicable standards for local detention facilities that include, *inter alia*, the following detailed physical design requirements from the California Building Code:

Title 24, Section 13-102(c)3, Operational Program Statement

Title 24, Section 13-102(c)5, Submittal of Plans and Specifications

Title 24, Section 13-102(c)6C, Design Requirements

Title 24, Part 2, Section 1231.2, Design Criteria for Required Spaces

Title 24, Part 2, Section 1231.3, Design Criteria for Furnishings and Equipment

These sections of the California Building Code include dozens of detailed physical requirements, and incorporate by reference dozens of additional California statutes and standards.  A copy of a state-issued summary of these building code requirements is attached as **Exhibit B** to this Complaint.

26.   The "minimum standards and requirements prescribed by the Board of State and Community Corrections" regarding the "care" of those in detention facilities are found in California Administrative Code §§ 1050–1059; §§ 1060–1073; §§ 1080–1084; and §§ 1200–1230.

27.   California Administrative Code Sections 1050–1059 set out detailed requirements regarding, *inter alia*:  Classification; Behavioral Crisis Identification; Administrative Separation; Use of Safety Cell; and Use of Restraints.

28.   California Administrative Code Section 1055 "Use of Safety Cell" requires, *inter alia*, the use of cells compliant with Title 24, Part 2, Section 1231.2.5 for people who display behavior which results in the destruction of property or reveals an intent to cause physical harm to self or others.  Cal. Code Regs, tit. 15, § 1055.

29.   Title 24, Part 2, Section 1231.2.5 mandates, *inter alia*:

A safety cell shall:

1.   Contain a minimum of 48 square feet (4.5 m2) of floor area with no one floor

COMPLAINT

dimension being less than 6 feet (1829 mm) and a clear ceiling height of 8 feet (2438 mm) or more;

2.  Be limited to one inmate;

3.  Contain a flushing ring toilet, capable of accepting solid waste, mounted flush with the floor, the controls for which must be located outside of the cell;

4.  Be padded as specified in Section 1231.3;

5.  Be equipped with a variable intensity, security-type lighting fixture which is inaccessible to the inmate occupant, control of which is located outside of the cell;

6.  Provide one or more vertical view panels not more than 4 inches (102 mm) wide nor less than 24 inches (610 mm) long which shall provide a view of the entire room;

7.  Provide a food pass with lockable shutter, no more than 4 inches (102 mm) high, and located between 26 inches (660 mm) and 32 inches (813 mm) as measured from the bottom of the food pass to the floor; and,

8.  Any wall or ceiling mounted devices must be inaccessible to the inmate occupant.

These requirements of the California Administrative Code are inconsistent with the requirements of 40 U.S.C. § 619, PBNDS 2.12, the U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, Office of Detention and Removal Operations, CONTRACT DETENTION FACILITY DESIGN STANDARDS for IMMIGRATION AND CUSTOMS ENFORCEMENT ("ICE Contract Detention Facility (CDF) Design Standards"), and other requirements in GEO's contracts with ICE.

30.    California Administrative Code Section 1055 also requires, *inter alia*, that "continued retention [of persons placed in a safety cell] shall be reviewed a minimum of every four hours."  Cal. Code Regs., tit. 15, § 1055.  This requirement of the California Administrative Code is inconsistent with the requirements of PBNDS 4.6.V.D.

31.    California Administrative Code Section 1058 "Use of Restraint Devices" mandates, *inter alia*, the "continued retention [use of restraints] shall be reviewed a minimum of every hour," "continuous direct visual observation shall be maintained until a medical opinion can be obtained," and "all events and information related to the placement in restraints shall be documented and shall be video recorded." Cal. Code Regs., tit. 15, § 1058.   This requirement of the California Administrative Code is inconsistent with the requirements of PBNDS 4.3.V.Y.

32.    California Administrative Code Sections 1060-1073 set out detailed requirements regarding, *inter alia*: Education Plan; Visiting; Correspondence; Exercise and Out of Cell Time;

9

Books, Newspaper, Periodicals, and Writings; Access to Telephone; Voting, and; Grievance Procedure.

33.     California Administrative Code Section 1061 "Education Plan" mandates, *inter alia*, that "the facility administrator shall develop and implement an education program…" "Such a plan shall provide for the voluntary academic or vocational, or both, education of housed people." Cal. Code Regs., tit. 15, § 1061.  This requirement of the California Administrative Code is inconsistent with the requirements of PBNDS 5.4.

34.     California Administrative Code Section 1063 "Correspondence" mandates, *inter alia*, indigent persons be allowed at least four postage paid envelopes a week for family and friends, and an unlimited number of postage paid envelopes for their attorney and court. Cal. Code Regs., tit. 15, § 1063.  This requirement of the California Administrative Code is inconsistent with the requirements of PBNDS 5.1.V.B.

35.     California Administrative Code Section 1071 "Voting" mandates *inter alia*, that "the facility shall develop written policies and procedures whereby the county registrar of voters allows qualified voters to vote in local, state, and federal elections, pursuant to election codes." Cal. Code Regs., tit. 15, § 1071.  This requirement of the California Administrative Code is inconsistent with the requirements of the PBNDS.

36.     California Administrative Code Sections 1080–1084 set out detailed requirements regarding, *inter alia*: Rules and Disciplinary Actions; Forms of Discipline, and; Limitations on Disciplinary Actions.

37.     California Administrative Code Section Sections 1081 ("Plan for Discipline of Incarcerated Persons") & 1082 ("Forms of Discipline") mandate a two-level severity scale for offenses and limit discipline for "minor acts" to temporary loss of television, telephones, commissary privileges, or "lockdown for less than 24 hours."  Cal. Code Regs., tit. 15, §§ 1081, 1082.   These requirements of the California Administrative Code are inconsistent with the requirements of PBNDS 3.1.

38.     California Administrative Code Section 1083 "Limitations on Disciplinary Actions" mandates, *inter alia*, the design and physical details of cells used for disciplinary segregation and

**COMPLAINT**

requires compliance with Title 24, Part 2, Section 1231.2.6 and 2.7. Cal. Code Regs., tit. 15, § 1083.

39.    Title 24, Part 2, Section 1231.2.6 mandates, *inter alia*:

Single-occupancy cells shall:

1. Have a maximum capacity of one inmate;
2. Contain a minimum of 60 square feet (5.6 m2) of floor area in Type I facilities and 70 square feet (6.5 m2) of floor area in Type II and Type III facilities;
3. Have a minimum clear ceiling height of 8 feet (2438 mm) and a minimum width of 6 feet (1829 mm);
4. Contain a toilet, wash basin and drinking fountain as specified in Section 1231.3; and
5. Contain a bunk, desk and seat as specified in Section 1231.3.

Title 24, Part 2, Section 1231.2.6.   This requirement of the California Administrative Code is inconsistent with the requirements of 40 U.S.C. § 619, PBNDS 2.12, the ICE Contract Detention Facility (CDF) Design Standards, and other requirements in GEO's contracts with ICE.

40.    California Administrative Code Sections 1200–1230 set out detailed requirements regarding, *inter alia*: Responsibility for Health Care Services; Health Care Service Audits; Health Care Staff Qualifications; Health Care Records; Management of Communicable Diseases in a Custody Setting; Medical Receiving Screening; Special Behavioral Health Assessment; Access to Treatment; Mental Health Services and Transfer to Treatment Facility; Individualized Treatment Plans; Pharmaceutical Management, and; Psychotropic Medications.

41.    California Administrative Code Section 1207 "Medical Receiving Screening" mandates *inter alia*, that "the facility administrator and responsible physician shall develop a written plan for complying with Penal Code Section 2656 (orthopedic or prosthetic appliance used by incarcerated persons)," which mandates, *inter alia*, that "[n]o person incarcerated in any facility of the Department of Corrections shall be deprived of the use or possession of any orthopedic or prosthetic appliance unless both the inmate's personal physician and a department physician concur in the professional opinion that such appliance is no longer needed."   Cal. Code Regs., tit. 15, § 1207.   This requirement of the California Administrative Code is inconsistent with the requirements contained in PBNDS 4.8.

42.    California Administrative Code Section 1209 "Mental Health Services and Transfer to Treatment Facility" mandates, *inter alia*, that "a mentally disordered incarcerated person who appears to be a danger to themself or others, or to be gravely disabled, shall be transferred for further

COMPLAINT

evaluation to a designated Lanterman Petris Short treatment facility designated by the county and approved by the State Department of Health Care Services for diagnosis and treatment of such apparent mental disorder pursuant to Penal Code section 4011.6 or 4011.8 unless the jail contains a designated Lanterman Petris Short treatment facility." Cal. Code Regs., tit. 15, § 1209. This requirement of the California Administrative Code is inconsistent with PBNDS 4.6 and other requirements in GEO's contracts with ICE.

43.    California Administrative Code Section 1216 "Pharmaceutical Management" includes numerous requirements and mandates, *inter alia*, that a "written report shall be prepared by a pharmacist, no less than annually, on the status of pharmacy services in the institution." Cal. Code Regs., tit. 15, § 1216. This requirement of the California Administrative Code is inconsistent with PBNDS 4.3V.G.

44.    California Administrative Code Section 1217 "Psychotropic Medications" includes numerous requirements and mandates, *inter alia*, a written policy "that limits the length of time both voluntary and involuntary psychotropic medications may be administered." Cal. Code Regs., tit. 15, § 1217. This requirement of the California Administrative Code is inconsistent with PBNDS 4.3V.O.

45.    The "minimum standards and requirements prescribed by the Board of State and Community Corrections" regarding "food" are found in California Administrative Code Sections §§ 1240–1249.

46.    California Administrative Code Section 1241 "Minimum Diet" requires compliance with the 2019 Dietary Reference Intakes (DRI) of the Food and Nutrition Board, Institute of Medicine of the National Academies, and the 2020–2025 Dietary Guidelines for Americans. In addition, Section 1241 mandates, *inter alia*:

  o  Protein Group daily requirements shall be equal to three servings (a total of 42 grams per day or 294 grams per week). In addition, there shall be a requirement to serve a fourth serving from the legumes three days a week;

  o  Dairy Group daily requirements of three servings per day and at least 450 mg.;

  o  Vegetable-Fruit Group daily requirement of five servings. At least one serving shall be from each of the following three categories:

COMPLAINT

- One serving of a fresh fruit or vegetable per day, or seven (7) servings per week.
- One serving of a Vitamin C source containing 30 mg. or more per day or seven (7) servings per week.
- One serving of a Vitamin A source, fruit or vegetable, containing 200 micrograms Retinol Equivalents (RE) or more per day, or seven servings per week.

  o  Grain Group daily requirements of at six servings and at least three servings from this group must be made with whole grains.

Section 1241 further provides:

> Providing only the minimum servings outlined in this regulation is not sufficient to meet an incarcerated person's caloric requirements. Additional servings from the dairy, vegetable-fruit, and bread-cereal groups must be provided in amounts to meet daily caloric requirements. Saturated dietary fat should not exceed 10 percent of total calories on a weekly basis. Fat shall be added only in minimum amounts necessary to make the diet palatable. Facility diets shall consider the recommendations and intentions of the 2020–2025 Dietary Guidelines of Americans of reducing overall sugar and sodium levels.

Cal. Code Regs., tit. 15, § 1241.  These requirements of the California Administrative Code are inconsistent with PBNDS 4.3V.G.

47.     California Administrative Code Section 1018 sets forth the administrative dispute process for the application and enforcement of the "minimum standards and requirements prescribed by the Board of State and Community Corrections."  Section 1018 notes that decisions of the Board of State and Community Corrections concerning the Board application and enforcement of standards and regulations "shall be final."  Cal. Code Regs., tit. 15, § 1018.  These requirements of the California Administrative Code are inconsistent with PBNDS 6.2, 6 U.S.C. § 205, and various provisions in GEO's contracts with ICE.

**II.  U.S. Immigration and Customs Enforcement Detention Facilities**

48.     In November 2002, Congress assigned the border-enforcement functions of the former Immigration and Naturalization Service to the newly created Bureau of Immigration and Customs Enforcement, housed within the Department of Homeland Security.[1]  The Bureau began

---

[1] U.S. Immigration & Customs Enforcement, *Honoring the History of ICE*, U.S. Department of Homeland Security, https://bit.ly/35Jas68 (last visited Oct. 21, 2024).

COMPLAINT

operations in March 2003 and was renamed U.S. Immigration and Customs Enforcement (ICE) in March 2007.

49.    Congress has authorized or required the detention of aliens under several different statutes and conditions. *See, e.g.*, 8 U.S.C. §§ 1225(b)(1)(B)(ii), 1225(b)(2)(A), 1226(a), 1226(c); *see also Jennings v. Rodriguez*, 583 U.S. 281, 285–289 (2018).

50.    Congress has granted the Secretary of Homeland Security broad authority "to make contracts … as may be necessary and proper to carry out [his] responsibilities," 6 U.S.C.§ 112(b)(2), including contracts with private parties. Congress has also granted the Secretary authority to "carr[y] out," "in [his] reasonable discretion," the activities of ICE "through any means, including … through contracts, grants, or cooperative agreements with non-Federal parties," except to the extent that such agreements are otherwise precluded by federal law.  28 U.S.C. § 530C(a)(4) (emphasis added).

51.    Congress has also directed that "[t]he [Secretary] shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal," 8 U.S.C. § 1231(g)(1), and it has instructed that ICE "shall consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for [detention]" "[p]rior to initiating any project for the construction of any new detention facility," *id*. § 1231(g)(2).

52.    Finally, in 2000, Congress enacted a statute stating: "Notwithstanding any other provision of law, … the [Secretary] hereafter may enter into contracts and other agreements, of any reasonable duration, for detention or incarceration space or facilities, including related services, on any reasonable basis." 18 U.S.C. § 4013 note "Contracts for Space or Facilities."[2]

---

[2] Although 8 U.S.C. § 1231(g), 28 U.S.C. § 530C(a), and the note accompanying 18 U.S.C. § 4013 all mention the "Attorney General," the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, transferred the immigration-enforcement functions and programs of the Immigration and Naturalization Service (INS) to the Secretary of Homeland Security, *see* 6 U.S.C. §§ 202(3), 251(2), 8 U.S.C. § 1103(a)(1); provided that the Secretary "shall have all functions relating to the [INS] that any other official could by law exercise in relation to the agency immediately before such transfer," 6 U.S.C. § 551(d)(2); and specified that for those transferred functions "reference in any other Federal law to any … officer … the functions of which are so transferred shall be deemed to refer to the Secretary," 6 U.S.C. § 557.  Therefore, insofar as each of the three provisions listed above relate to the immigration detention-and-removal program, their references to the "Attorney General" are deemed to refer to the Secretary.  *See, e.g.*, *Reyna ex rel. J.F.G. v. Hott*, 921 F.3d 204, 208 n.* (4th Cir. 2019) (explaining that the mention of the Attorney

14

**COMPLAINT**

53.     Thus, Congress has granted ICE, the Secretary's designee, the discretion to use private contractors to arrange for detention. *See United States v. California*, 921 F.3d at 882 n.7.

54.     Pursuant to this authority, ICE "manages and oversees the nation's civil immigration detention system.[3]

**III.  ICE Federal Detention Standards**

55.     In response to the Congressional mandate to identify "appropriate" facilities, 8 U.S.C. § 1231(g)(1), federal immigration regulations identify qualifying criteria for entities contracted to provide detention services.  Chief among those is "compliance with the Standard Statement of Work for Contract Detention Facilities," which incorporates the PBNDS.  8 C.F.R. § 235.3(e); *Pimentel-Estrada v. Barr*, 458 F. Supp. 3d 1226, 1235 (W.D. Wash. 2020); *Lyon v. U.S. ICE*, 171 F. Supp. 3d 961, 990 (N.D. Cal. 2016); *D.A. v. United States*, 663 F. Supp. 3d 715, 740 (W.D. Tex. 2023) (finding compliance with PBNDS is "non-discretionary duty").

56.     ICE mandates, *inter alia*, that all its contractors (state and private) providing detention services operate in conformance with the PBNDS.

57.     The "Preface" to the PBNDS provides, *inter alia*:

> ICE is charged with removing aliens who lack lawful status in the United States and focuses its resources on removing criminals, recent border entrants, immigration fugitives, and recidivists.  Detention is an important and necessary part of immigration enforcement.  Because ICE exercises significant authority when it detains people, ICE must do so in the most humane manner possible with a focus on providing sound conditions and care.  ICE detains people for no purpose other than to secure their presence both for immigration proceedings and their removal, with a special focus on those who represent a risk to public safety, or for whom detention is mandatory by law.

> The PBNDS 2011 reflect ICE's ongoing effort to tailor the conditions of immigration detention to its unique purpose.

The 2011 PBNDS are available at:  https://www.ice.gov/detention-standards/2011.

General in 8 U.S.C. § 1231(g) shall be deemed to refer to the Secretary); *cf. Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005).
[3] U.S. Immigration & Customs Enforcement, *Detention Management*, U.S. Department of Homeland Security, https://bit.ly/2ZvGnGO (last visited Oct. 21, 2024).

15

COMPLAINT

58.     The PBNDS are approximately 450 pages in length, and include detailed standards governing facility:   (1) Safety, including detailed requirements relating to Emergency Plans, Environmental Health and Safety, and Transportation; (2) Security, including detailed requirements relating to Admission and Release, Custody Classification, Contraband, Facility Security and Control, Funds and Personal Property, Hold Rooms in Detention Facilities, Key and Lock Control, Population Counts, Post Orders, Searches of Detainees, Sexual Abuse and Assault Prevention and Intervention, Special Management Units, Staff-Detainee Communication, Tool Control, Use of Force and Restraints; (3) Order, including detailed requirements relating to Disciplinary System; (4) Care, including detailed requirements relating to Food Service, Hunger Strikes, Medical Care, Medical Care (Women), Personal Hygiene, Significant Self Harm and Suicide Prevention and Intervention, Terminal Illness, Advance Directives and Death, Disability Identification, and Assessment and Accommodation; (5) Activities, including detailed requirements relating to Correspondence and Other Mail, Trips for Non-Medical Emergencies, Marriage Requests, Recreation, Religious Practices, Telephone Access, Visitation, and Voluntary Work Program; (6) Justice, including detailed requirements relating to Detainee Handbook, Grievance System, Law Library and Legal Materials, and Legal Rights Group Presentations; (7) Administration and Management, including detailed requirements relating to Detention Files, Interviews and Tours, Staff Training, Detainee Transfers and Definitions.

59.     The current PBNDS were implemented at the explicit direction of Congress.  The Joint Explanatory Statement and House Report No. 114-668 (2016), which accompany the Fiscal Year (FY) 2017 Department of Homeland Security (DHS) Appropriations Act (Pub. L. No. 115-31) evince this direction. The Joint Explanatory Statement says: "Within 45 days after the enactment of this Act, ICE shall report on its progress in implementing the 2011 Performance Based National Detention Standards, including the 2016 revisions…" 163 Cong. Rec. H3812 (2017).  House Report No. 114-668 states: "Within 45 days after the date of enactment of this Act, ICE shall report on its progress in implementing the 2011 PBNDS and requirements related to PREA, including a list of facilities that are not yet in compliance; a schedule for bringing facilities into compliance; and current year and estimated future year costs associated with compliance."  H.R. Rep. No. 114-668,

**COMPLAINT**

at 35.

60.     As part of a consolidated appropriations act, Congress restricted ICE's expenditure of federal detention funds to ensure that contracted facilities comply with the PBNDS.  *See* Pub. L. No. 110-329, Div. D, Tit. II (Sept. 30, 2008), 122 Stat. 3574.  Congress provided that no federal detention funds "may be used to continue any contract for the provision of detention services if the two most recent overall performance evaluations received by the contracted facility are less than 'adequate' or the equivalent median score in any subsequent performance evaluation system."  *Id*. (emphasis added); *Xirum v. U.S. ICE*, 2024 WL 3718145, at *3 (S.D. Ind. Aug. 8, 2024).

61.     Similarly, Congress created a specific mechanism for oversight and enforcement of the "sound conditions and care" required by the PBNDS when it created the Office of the Immigration Detention Ombudsman to, *inter alia*, investigate complaints and conduct investigations of any alleged violations of the federal "detention standards."  6 U.S.C. § 205(b)(5).

**IV. GEO's Contracts With ICE For Detention Services in California**

62.     GEO currently provides contracted secure residential immigration services to ICE at several locations in California.

63.     Pursuant to a 2019 contract ("ICE Mesa Verde Contract"), GEO currently provides secure residential immigration services to ICE at the Mesa Verde ICE Processing Center, located at 425 Golden State Avenue, Bakersfield, CA 9330; the Golden State Annex, located at 611 Frontage Road, McFarland, CA 93250; and the Central Valley Annex, located at 254 Taylor Avenue, McFarland, CA 93250.

64.     The ICE Mesa Verde Contract provides, *inter alia*:

All services shall be furnished in compliance with the following regulations/policies/standards:

2011 Performance Based National Detention Standards (PBNDS 2011) as revised in DEC 2016 Prison Rape Elimination Act (PREA) standards for DHS detention facilities American Correctional Association (ACA) Standards National Commission on Correctional Health Care (NCCHC) Standards.

65.     Reviewing courts have confirmed that compliance with the PBNDS is mandatory. *Lyon v. U.S. ICE*, 171 F. Supp. 3d 961, 990 (N.D. Cal. 2016) (noting mandatory application of

**COMPLAINT**

PBNDS); *D.A. v. United States*, 663 F. Supp. 3d at 740 (finding compliance with PBNDS is "non-discretionary duty").

66.     The ICE Mesa Verde Contract also directs GEO to review the ICE Contract Detention Facility (CDF) Design Standards and notes that "ICE will review and approve all design documents and maintain approval of final inspection of the facility before occupancy."

67.     On August 13, 2024, a California county inspector sent GEO staff a message noting that "SB-1132 recently passed, and it talk[s] about the County inspecting detention facility including inspection frequency and areas that need to be inspected."   This message advised the county inspector "may need to see the housing portion of the facility," and advised GEO that it should consider how SB-1132 "will affect your facilit[ies]."

68.     As detailed in paragraphs 18-45 above, numerous standards and requirements prescribed by the Board of State and Community Corrections conflict with or are inconsistent with the requirements in the PBNDS and GEO's other contractual obligations under the ICE Mesa Verde Contract.

**COUNT I: VIOLATION OF INTERGOVERNMENTAL IMMUNITY**
**(DIRECT REGULATION)**

69.     Plaintiff re-alleges and incorporates by reference the allegations of the preceding paragraphs.

70.     GEO, as a contractor for the United States, enjoys and is clothed with the Federal Government's intergovernmental immunity.  *See Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180–81 (1988); *Boeing Co. v. Movassaghi*, 768 F.3d 832, 839 (9th Cir. 2014).

71.     Under the Supremacy Clause of the United States Constitution, "the activities of the Federal government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943).  State laws run afoul of intergovernmental immunity when they "involve[] a direct, physical interference with federal activities … or some direct, immediate burden on the performance of the [federal] functions." *Railway Mail Ass'n v. Corsi*, 326 U.S. 88, 96 (1945).  When state

COMPLAINT

regulation of a contractor would control federal operations, "[e]nforcement of the substance of [the regulation] against the contractors would have the same effect as direct enforcement against the Government." *GEO Grp., Inc.*, 50 F.4th at 760.

72.     By prescribing operational requirements regarding numerous aspects of federal private detention facilities, SB-1132 substantially interferes with federal government operations and places immediate burdens on the performance of federal functions.

73.     The State of California's attempt to override and replace the congressionally mandated federal detention standards contained in GEO's contracts with ICE substantially interferes with GEO's contracts and ICE's ability to carry out its detention responsibilities for the federal government.

74.     Congress has not authorized the State of California to regulate the federal government's activities with respect to federal immigration detention facilities.

75.     SB-1132 is unconstitutional and invalid as applied to GEO's operations of federal immigration facilities in California on behalf of ICE because it directly regulates the United States' operation of federal immigration detention facilities.  *United States v. Washington*, 596 U.S. 832 (2022); *Boeing Co.*, 768 F.3d 832 (9th Cir. 2014).

## COUNT II:   FEDERAL PREEMPTION
### (FIELD PREEMPTION)

76.     Plaintiff re-alleges and incorporates by reference the allegations of the preceding paragraphs.

77.     Federal immigration law provides that the Secretary of Homeland Security "shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal," and "[w]hen United States facilities are unavailable or facilities adapted or suitably located for detention are unavailable for rental, the [Secretary] may expend … amounts necessary to acquire land and to acquire, build, remodel, repair, and operate facilities … necessary for detention." 8 U.S.C. § 1231(g)(1).  Congress has instructed that ICE "shall consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for [detention]" before beginning any project to develop a new detention facility.  8 U.S.C.

**COMPLAINT**

§ 1231(g)(2).

78.     In enacting Section 1231(g)(1), "Congress … placed the responsibility of determining where aliens are detained within the discretion of the [Secretary]." *Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434, 1440 (9th Cir. 1986).  That discretion is "broad."  *Id*. at 1441.

79.     To effectively arrange for appropriate places of detention for removal aliens, Congress further granted the Secretary authority "to make contracts … as may be necessary and proper to carry out [his] responsibilities," 6 U.S.C. § 112(b)(2), including contracts with private parties.

80.     Congress further authorized the Secretary, in his "reasonable discretion," to carry out the immigration enforcement activities of the Department of Homeland Security "through any means," including "through contracts, grants, or cooperative agreements with non-Federal parties." 28 U.S.C. § 530C(a)(4).

81.     Congress has also authorized the Secretary to "enter into contracts and other agreements, of any reasonable duration, for detention or incarceration space or facilities, including related services, on any reasonable basis."  18 U.S.C. § 4013 note "Contracts and Agreements for Detention and Incarceration Space or Facilities".

82.     Where Congress delegates broad discretion to an Executive Branch official to achieve some end, state laws are preempted when they frustrate the natural effect of that delegation and blunt the consequences of Executive acts taken pursuant to the delegation. *See Crosby*, 530 U.S. at 372–77.

83.      Federal statutory directives and a comprehensive set of federal detention standards govern the operation of ICE's private detention facilities, including every aspect of detention covered by SB-1132.

84.     The current PBNDS were implemented at the direction of Congress.  The Joint Explanatory Statement and House Report No. 114-668, which accompany the Fiscal Year (FY) 2017 Department of Homeland Security (DHS) Appropriations Act (Pub. L. No. 115-31) evince this direction.  The Joint Explanatory Statement says: "Within 45 days after the enactment of this Act, ICE shall report on its progress in implementing the 2011 Performance Based National Detention

COMPLAINT

Standards, including the 2016 revisions…" 163 Cong. Rec. H3812 (2017).  House Report No. 114-668 states : "Within 45 days after the date of enactment of this Act, ICE shall report on its progress in implementing the 2011 PBNDS and requirements related to PREA, including a list of facilities that are not yet in compliance; a schedule for bringing facilities into compliance; and current year and estimated future year costs associated with compliance." H.R. Rep. No. 114-668, at 35.

85.     As part of a consolidated appropriations act, Congress restricted ICE's expenditure of federal detention funds to ensure that contracted facilities comply with the PBNDS.  See Pub. L. No. 110-329, Div. D, Tit. II (Sept. 30, 2008), 122 Stat. 3574.  Congress provided that no federal detention funds "may be used to continue any contract for the provision of detention services if the two most recent overall performance evaluations received by the contracted facility are less than 'adequate' or the equivalent median score in any subsequent performance evaluation system." *Id.* (emphasis added).

86.     Congress also adopted 6 U.S.C. § 205, creating the Office of the Immigration Detention Ombudsman to hear and resolve complaints regarding compliance with the health and safety standards imposed by the PBNDS.

87.     The comprehensive framework enacted by Congress regarding the detention and care of aliens pending removal leads to the conclusion that the Federal Government has occupied the field.  *See Arizona v. United States*, 567 U.S. 387 (2012); *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 419 n.11 (2003).  *See also* Viet D. Dinh, *Reassessing the Law of Preemption*, 88 Geo. L.J. 2085, 2098–2099, 2107 (2000) (same).

88.     Where Congress occupies an entire field, as it has in the field of alien detention pending removal, even complementary state regulation is impermissible.  "Field preemption reflects a congressional decision to foreclose *any state regulation in the area, even if it is parallel to federal standards*." *See Arizona*., 567 U.S. at 401 (citing *Silkwood v. Kerr-McGee Corp*., 464 U.S. 238, 249 (1984)).

89.     The doctrine of field preemption also applies to "a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Rice v. Santa Fe Elevator Corp*., 331 U.S. 218, 230 (1947); *Arizona*, 567 U.S. at

**COMPLAINT**

399.   This version of field preemption also has roots in the arena of immigration.  *Hines v. Davidowitz*, 312 U.S. 52 (1941).  As explained in *Hines*, the detention of aliens implicates both the federal government's interest in a "uniform" immigration system and in the conduct of foreign relations.  *Id*. at 64–66; *Arizona*, 567 U.S. at 395 (noting that "foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States"); *see* generally U.S. Const. art. I, § 8, cl. 3–4, 10–13.   Concern for orderly immigration and for the reciprocal treatment of United States citizens detained abroad "make the treatment of aliens, in whatever state they may be located, a matter of national moment." *Hines*, 312 U.S. at 73.  Thus, "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations." *Matthews v. Diaz*, 426 U.S. 67, 81 n.17 (1976).  The conditions of confinement are therefore the quintessential "field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Rice*, 331 U.S. at 230.

90.   SB-1132 is unconstitutional and invalid as applied to GEO's provision of detention services in California on behalf of ICE because it is preempted by Congress's occupation of the entire field of alien detention and care pending removal and because of the dominant federal interests associated with the care and treatment of immigration detainees.

## COUNT III:  FEDERAL PREEMPTION
### (OBSTCLE PREEMPTION)

91.   As early as *Gibbons*, Chief Justice Marshall stated the governing principle—that "acts of the State Legislatures … [which] interfere with, or are contrary to the laws of Congress, made in pursuance of the constitution," are invalid under the Supremacy Clause.  22 U.S. at 211.  More than 100 years later Justice Black, after reviewing the precedents, wrote in a similar vein that, while "[t]his Court, in considering the validity of state laws in the light of treaties or federal laws touching the same subject, ha[d] made use of the following expressions: conflicting; contrary to; occupying the field; repugnance; difference; irreconcilability; inconsistency; violation; curtailment; and interference [,] … [i]n the final analysis," our function is to determine whether a challenged

COMPLAINT

state statute "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines*, 312 U.S. at 67.

92.     In cases where federal and state law conflict, "federal law prevails and state law is preempted." *Murphy v. NCAA*, 584 U.S.453, 471 (2018).  Local law will also be found to be preempted by federal law whenever the "challenged state statute 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"  *Perez v. Campbell*, 402 U.S. 637, 649 (1971) (quoting *Hines*, 312 U.S. at 67); *see also Rust v. Johnson*, 597 F.2d 174, 179 (9th Cir. 1979) (local government cannot override federal interest even though local government was engaged in valid state function).

93.     Compliance with many of the requirements contained in SB-1132 and those contained in the PBNDS applicable to GEO's contracts with ICE in California is impossible because of inconsistencies and conflicts.

94.     SB-1132 as a whole constitutes an impermissible obstacle to Congress's purpose and intent to create a uniform federal framework and standards tailored to the unique circumstances associated with the detention of aliens pending removal.

95.     If all 50 States were to adopt similar legislation, the results for federal immigration enforcement would be a crippling patchwork of differing state standards subject to state enforcement and oversight.

96.     If states are allowed to dictate the conditions of federal immigration confinement it would present an obstacle to the federal government's conduct of foreign relations and its ability to ensure uniform treatment of foreign nationals in United States custody.  *Matthews*, 426 U.S. at 81 n.17; *Arizona*, 567 U.S. at 395.

97.      (noting that "foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States").

///

///

///

23

**COMPLAINT**

**PRAYER FOR RELIEF**

WHEREFORE, The GEO Group, Inc., respectfully requests that this Court enter an order and judgment:

    a.   Declaring that SB-1132 violates the Supremacy Clause of the United States Constitution and is unconstitutional as applied to GEO in its operation of detention facilities for ICE;

    b.   Preliminarily and permanently enjoining Defendants, as well as their successors, agents, employees, and all those under their supervision, from enforcing, whether prospectively or retroactively, SB-1132 against GEO in its operation of detention facilities for ICE

    c.   Awarding attorneys' fees and costs as permitted by law; and

    d.   Granting such other and further relief as this Court deems just and proper.


DATED: October 22, 2024          DAVIS WRIGHT TREMAINE LLP
                                      NICOLE S. PHILLIS *(admission pending)*
                                      MATTHEW E. LADEW
                                      HARRY J. F. KORRELL *(pro hac vice forthcoming)*

                                  By:_____
                                         Matthew E. Ladew

                                    SCOTT A. SCHIPMA *(pro hac vice forthcoming)*
                                      JOSEPH NEGRON, JR. *(pro hac vice forthcoming)*

                                      Attorneys for Plaintiff
                                      THE GEO GROUP, INC.

COMPLAINT